1   Robert C. Moest, Of Counsel, SBN 62166
2   **THE BROWN LAW FIRM, P.C.**
    2530 Wilshire Boulevard, Second Floor
3   Santa Monica, California 90403
    Telephone: (310) 915-6628
4   Facsimile: (310) 915-9897
    Email: RMoest@aol.com

5   *Counsel for Plaintiff*

6

7              **IN THE UNITED STATES DISTRICT COURT**
8              **CENTRAL DISTRICT OF CALIFORNIA**

9   MICHAEL   IGELIDO,   derivatively   on
10  behalf of FUNKO, INC.
                                              Case No.:
11        Plaintiff,

12        v.

13                                            DEMAND FOR JURY TRIAL
14  BRIAN MARIOTTI, JENNIFER FALL
    JUNG, RUSSELL NICKEL, KEN
15  BROTMAN, GINO DELLOMO,
    CHARLES DENSON, DIANE IRVINE,
16  ADAM KRIGER, MICHAEL
    LUNSFORD, and SARAH
17  KIRSHBAUM LEVY,

18        Defendants,

19
          and
20

21  FUNKO, INC.,

22        Nominal Defendant.

23

24           **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

25

26

27

28
                    Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Michael Igelido ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Funko, Inc. ("Funko" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Brian Mariotti, Jennifer Fall Jung, Russell Nickel, Ken Brotman, Gino Dellomo, Charles Denson, Diane Irvine, Adam Kriger, Michael Lunsford, and Sarah Kirshbaum Levy (collectively, the "Individual Defendants," and together with Funko, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Funko and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included a review of Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, conference call transcripts, securities analysts' reports about the Company, legal filings, news reports, and information publicly available on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action seeking to redress wrongdoing committed by certain of Funko's directors and officers from August 8, 2019 through the present (the "Relevant Period"), which has caused substantial damage to the Company.

2.     Funko is a provider of action figures, plush products, apparel, accessories, and homeware that are based on and emulate characters and imagery from a wide variety of well-known pop culture franchises. Funko's most well-recognized products are its

Funko Pop! figures, a series of vinyl figurines depicting characters from popular franchises such as Star Wars, Disney, Marvel Comics, DC Comics, Harry Potter, and more.

3.     During the Relevant Period, the Individual Defendants frequently touted the Company's sales and allegedly strong financial prospects. Additionally, in the Company's quarterly reports on Form 10-Q filed with the SEC in August 2019 and October 2019, respectively, the Individual Defendants emphasized the importance of accurately gauging demand for Funko's products, so that the Company could maintain sufficient inventory levels. In the Company's quarterly reports, the Individual Defendants represented that *if* the Company's sales failed to meet expectations, such failures *could* result in excess inventory, which would necessitate inventory write-downs and associated costs.

4.      In reality, not only was the Company actually facing declining sales, but the Company's dwindling sales figures would ultimately cause Funko to incur over $16 million in write-down relating to disposal of excess products inventory.

5.     After the market had closed on February 5, 2020, the Company issued its preliminary financial results for the fourth quarter of 2019, shocking the market with dwindling sales and millions of dollars in inventory write-downs. Specifically, the Company revealed an 8% decrease in net sales compared to the fourth quarter of the Company's prior fiscal year, as well as $16.8 million in inventory write-down to dispose of certain slow moving inventory.

6.     On this news, Funko's stock price nosedived, falling from $15.49 per share at the close of trading on February 5, 2020, to $9.29 per share at the close of trading on February 6, 2020, representing a loss of around 40%.

7.     Not long after, on March 5, 2020, the Company issued its fourth quarter and full year 2019 financial results, confirming the results previously disclosed on February 5, 2020, including a 4% decrease in the Company's net sales compared to the prior fiscal

year. The Individual Defendants claimed that the Company's disappointing financial results were caused by "softness at retail during the holiday season."

8.      On this news, the price of the Company's stock fell once again, declining from $7.24 per share at the close of trading on March 5, 2020, to $6.92 per share at the close of trading on March 6, 2020, a loss of roughly 4%.

9.      During the Relevant Period, the Individual Defendants breached their fiduciary duties to Funko by making and/or causing the Company to make a series of materially false and misleading statements to the investing public regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) The Company was facing sales that were below expectations; (2) as a result, the Company would predictably incur millions of dollars in write-down to dispose of slow moving inventory; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public, while four of the Individual Defendants engaged in lucrative insider sales before the fraud was exposed, netting combined proceeds of over $104 million.

11.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

12.     The Individual Defendants' misconduct and breaches of fiduciary duty have caused the Company, along with its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former CFO to be named as defendants in three federal securities fraud class action lawsuits, two pending in the United States District Court for

the Central District of California, and one pending in the United States District Court for the Western District of Washington (the "Securities Class Actions"). Additionally, the Company has been subjected to the need to undertake internal investigations, the need to implement adequate internal controls over the Company's financial reporting, losses due to the unjust enrichment of the Individual Defendants who were over-compensated by the Company given their misconduct and/or who benefitted from the wrongdoing described herein, and losses due to the waste of corporate assets, all of which will cost the Company millions of dollars going forward.

13.     Considering the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom currently serve as Company directors, the directors' collective engagement in fraud and misconduct, the strong likelihood of the directors' liability in this derivative action and the Company's CEO's liability in the Securities Class Actions, and in light of the directors not being disinterested and/or independent, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

Verified Shareholder Derivative Complaint

17. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

18. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Company and the Individual Defendants have conducted business in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19. Plaintiff is a current shareholder of Funko and has continuously held Funko common stock since before the beginning of the Relevant Period.

### Nominal Defendant Funko

20. Funko is a Delaware corporation, with its headquarters located at 2802 Wetmore Avenue, Everett Washington 98201. Funko's shares trade on NASDAQ under the ticker symbol "FNKO."

21. Funko's common stock is divided into two categories: Class A common stock, which is publicly traded, and Class B common stock, for which there is no public trading market. Both classes of common stock entitle holders to one vote per share on all matters presented to Company shareholders.

### Defendant Mariotti

22. Defendant Brian Mariotti ("Mariotti") is the Company's current CEO, and has served in that role since April 2017. The Company's Schedule 14A filed with the SEC on April 15, 2020 (the "2020 Proxy Statement") described Defendant Mariotti as follows:

Brian Mariotti has served as Funko, Inc.'s Chief Executive Officer and as a member of Funko, Inc.'s Board of Directors since its formation in April 2017, as the Chief Executive Officer of FAH, LLC and as a member of FAH, LLC's board of directors since October 2015, and as Chief Executive Officer of FHL and as a member of FHL's board of directors since May 2013. Mr. Mariotti has also served as Chief Executive Officer of Funko, LLC since he acquired the business with a small group of investors in 2005. We believe Mr. Mariotti's knowledge of the pop culture industry and many years of experience as our Chief Executive Officer make him well-qualified to serve as a member of our Board of Directors.

23.    Defendant Mariotti has served as the CEO of Funko Acquisition Holdings, L.L.C. ("FAH") since October 2015, and as the CEO of Funko Holdings LLC ("FHL") since May 2013, both of which are holding companies with no assets. FAH owns 100% of FHL, which in turn owns 100% of Funko, LLC, the Company's operating entity.

24.    According to the 2020 Proxy Statement, Defendant Mariotti was the beneficial owner of 3,464,295 shares of the Company's Class A common stock, as well as 2,531,690 shares of the Company's Class B common stock as of April 3, 2020, which afforded him approximately 5.1% of total voting power over matters set for shareholder determination as of that date. As the price of the Company's Class A common stock was $3.18 per share at close on April 3, 2020, Defendant Mariotti owned over $11 million worth of Company stock.

25.    Defendant Mariotti received $4,025,457 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $1,000,000 in salary, $357,938 in stock awards, $1,341,827 in option awards, $1,313,250 in non-equity incentive plan compensation, and $12,442 in all other compensation.

26.    During the period when the Individual Defendants materially misstated information to the investing public to keep the price of the Company's stock artificially inflated, and before the scheme was exposed, Defendant Mariotti made the following sales of the Company's Class A common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
| --- | --- | --- | --- |

Verified Shareholder Derivative Complaint

| 8/12/2019 | 50,000 | $23.55 | $1,177,500 |
| 9/19/2019 | 400,000 | $25.42 | $10,168,000 |
| 9/20/2019 | 50,000 | $22.65 | $1,132,500 |
| 10/21/2019 | 50,000 | $18.14 | $907,000 |

27.    In total, before the fraud was exposed, he sold 550,000 Company shares on inside information, for which he received approximately $13,385,000. Defendant Mariotti's insider sales, which were made with knowledge of material non-public information, demonstrate his motive in facilitating and participating in the scheme.

### Defendant Fall Jung

28.    Defendant Jennifer Fall Jung ("Fall Jung") is the Company's current CFO, and has served in that role since August 2019. The Company's annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K") described Defendant Fall Jung as follows:

> Jennifer Fall Jung has served as Funko, Inc.'s Chief Financial Officer since August 2019. Ms. Fall Jung previously served as Senior Vice President, Corporate Finance and Investor Relations of Gap, Inc. ("Gap"), a global clothing and accessories retailer, from January 2017 to March 2018. Prior to January 2017, Ms. Fall Jung served in various other roles at Gap, including Senior Vice President and Chief Financial Officer of Old Navy Global and Head of International from November 2012 to January 2017, Chief Financial Officer and Senior Vice President of Gap North America from February 2011 to November 2012, and Chief Financial Officer and Vice President of Strategy and Real Estate for Gap, Inc. Outlet from April 2007 to February 2011. Ms. Fall Jung received her B.B.A. in Finance and her M.B.A., with an emphasis in International Business from San Diego State University.

29.    Defendant Fall Jung received $1,248,155 in compensation from the Company during the fiscal year ended December 31, 2019,  which consisted of $153,654 in salary, $212,486 in stock awards, $790,622 in option awards, $67,262 in non-equity incentive plan compensation, and $24,131 in all other compensation.

### Defendant Nickel

30.    Defendant Russell Nickel ("Nickel") is the Company's former CFO, serving

as CFO from October 2013 until he resigned in August 2019. Subsequently, he served as a Special Advisor to Funko until December 31, 2019. The Company's annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K") described Defendant Nickel as follows:

> Russell Nickel has served as Funko, Inc.'s Chief Financial Officer since its formation in April 2017, and as the Chief Financial Officer and Secretary of FAH, LLC since October 2013. Mr. Nickel was Vice President of Finance at ClipCard from May 2013 until October 2013, and the Institute for Corporate Productivity (i4cp) from 2011 until 2013, where he was responsible for all finance, accounting, and legal matters. Before joining i4cp, Mr. Nickel held various senior finance and accounting positions in other companies and also worked in public accounting, including as an Audit Manager at KPMG, LLP. Mr. Nickel received a B.A. in Accounting from the University of Washington.

### *Defendant Brotman*

31.    Defendant Ken Brotman ("Brotman") is the Company's current Chairman of the Board, and has served as a Company director since April 2017. Defendant Brotman currently serves as a managing partner at ACON Funko Investors L.L.C. ("ACON") a private equity investment firm he co-founded in 1996, and a significant shareholder of Funko. He is also a current director of FAH, and has served in that role since October 2015. The 2020 Proxy Statement described Defendant Brotman as follows:

> Ken Brotman has served on the Board of Directors of Funko, Inc. since its formation in April 2017, and on the board of directors of FAH, LLC since October 2015. Mr. Brotman is a Founder and Managing Partner at ACON Investments, which he co-founded in 1996. Before that, Mr. Brotman was a partner at Veritas Capital, Inc. from 1993 until 1996, and, between 1987 and 1993, held positions at various private equity firms including Bain Capital and Wasserstein Perella Management Partners. Mr. Brotman has served on the board of directors of various ACON Investments portfolio companies since 1997 including several in the retail and consumer products sectors. Mr. Brotman received an M.B.A. from Harvard Business School and a B.S. in Economics from The Wharton School of the University of Pennsylvania. We believe Mr. Brotman's extensive private equity investment and company strategy and oversight experience and background with respect to

8

Verified Shareholder Derivative Complaint

acquisitions, debt financings and equity financings makes him well-qualified to serve as a member and as the chairman of our Board of Directors.

32.     Defendant Brotman also serves as the Chair of Funko's Nominating and Corporate Governance Committee, and as a member of its Compensation Committee.

33.     Defendant Brotman received $163,525 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $90,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

34.     During the period when the Individual Defendants materially misstated information to the investing public to keep the price of the Company's stock artificially inflated, and before the scheme was exposed, ACON made the following sale of the Company's Class A common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 9/19/2019 | 3,600,000 | $25.42 | $91,512,000 |

35.     ACON's insider sale, which was made with knowledge of material non-public information, demonstrates Defendant Brotman's motive in facilitating and participating in the scheme.

### *Defendant Dellomo*

36.     Defendant Gino Dellomo ("Dellomo") is a current Company director, and has served in that role since April 2017. Additionally, he has served as a director of FAH since October 2015, and as a director at ACON since October 2006. The 2020 Proxy Statement described Defendant Dellomo as follows:

Gino Dellomo has served on the Board of Directors of Funko, Inc. since its formation in April 2017, and on the board of directors of FAH, LLC since October 2015. Mr. Dellomo is a Director at ACON Investments L.L.C. ("ACON Investments"), which he joined in October 2006. Since October 2006, he has also served on the board of directors of various ACON Investments portfolio companies. Between 2001 and 2006, Mr. Dellomo held various positions at various investment banks, including Deutsche Bank Securities, Inc., FBR Capital Markets & Co. and MCG Capital Corp. Mr. Dellomo received a B.S. in Finance from Georgetown University. We

believe Mr. Dellomo's private equity investment and company oversight experience and background with respect to acquisitions, debt financings and equity financings makes him well-qualified to serve as a member of our Board of Directors.

37.   Defendant Dellomo also serves as a member of Funko's Nominating and Corporate Governance Committee.

38.   Defendant Dellomo received $123,525 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $50,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

39.   During the period when the Individual Defendants materially misstated information to the investing public to keep the price of the Company's stock artificially inflated, and before the scheme was exposed, ACON made the following sale of the Company's Class A common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 9/19/2019 | 3,600,000 | $25.42 | $91,512,000 |

40.   ACON's insider sale, which was made with knowledge of material non-public information, demonstrates Defendant Dellomo's motive in facilitating and participating in the scheme.

### Defendant Denson

41.   Defendant Charles Denson ("Denson") is a current Company director, and has served in that role since April 2017. Additionally, he has served as a director of FAH since June 2016. The 2020 Proxy Statement described Defendant Denson as follows:

Charles Denson has served on the Board of Directors of Funko, Inc. since its formation in April 2017, and on the board of directors of FAH, LLC since June 2016. Mr. Denson has served as the President and Chief Executive Officer of Anini Vista Advisors, an advisory and consulting firm, since March 2014. From February 1979 until January 2014, Mr. Denson held various positions at NIKE, Inc., where he was appointed to several management roles, including, in 2001, President of the NIKE Brand, a position he held until January 2014. Mr. Denson serves on the board of

directors of several privately held organizations. Mr. Denson received a B.A. in Business from Utah State University. We believe Mr. Denson's extensive experience in brand building, brand management and organizational leadership in the public company context makes him well-qualified to serve on our Board of Directors.

42.     Defendant Denson also serves as the Chair of Funko's Compensation Committee, and as a member of its Audit Committee.

43.     According to the 2020 Proxy Statement, Defendant Denson was the beneficial owner of 159,517 shares of the Company's Class A common stock, as well as 16,058 shares of the Company's Class B common stock as of April 3, 2020. As the price of the Company's Class A common stock was $3.18 per share at close on April 3, 2020, Defendant Denson owned approximately $507,264 worth of Company stock.

44.     Defendant Denson received $138,525 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $65,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

### Defendant Irvine

45.     Defendant Diane Irvine ("Irvine") is a current Company director, and has served in that role since August 2017. Additionally, she has served as a director of FAH since August 2017. The 2020 Proxy Statement described Defendant Irvine as follows:

Diane Irvine has served on the Board of Directors of Funko, Inc. and the board of directors of FAH, LLC since August 2017. Ms. Irvine previously served as Chief Executive Officer of Blue Nile, Inc., an online retailer of diamonds and fine jewelry, from February 2008 until November 2011, as President from February 2007 until November 2011, and as Chief Financial Officer from December 1999 until September 2007. From February 1994 until May 1999, Ms. Irvine served as Vice President and Chief Financial Officer of Plum Creek Timber Company, Inc., and from September 1981 until February 1994, she worked at accounting firm Coopers & Lybrand LLP in various capacities, most recently as partner. Ms. Irvine currently serves on the boards of directors of Casper Sleep Inc. (on whose board she has served since August 2019), Yelp Inc. (on whose board she has served since September 2011) and D.A. Davidson & Co. (on whose board she has served since January 2018), and previously served on the boards of directors

of XO Group Inc. from November 2014 until December 2018, Rightside Group Ltd. from August 2014 until July 2017, CafePress, Inc. from July 2012 until May 2015, and Blue Nile, Inc. from May 2001 until November 2011. Ms. Irvine received an M.S. in Taxation and a Doctor of Humane Letters from Golden Gate University, and a B.S. in Accounting from Illinois State University. We believe Ms. Irvine's extensive leadership experience as a Chief Financial Officer and Chief Executive Officer at Blue Nile, Inc., her financial expertise, and her experience as a director of several public companies make her well-qualified to serve as a member of our Board of Directors. Ms. Irvine also contributes to the gender diversity of our Board of Directors.

46.     Defendant Irvine also serves as the Chair of Funko's Audit Committee, and as a member of its Compensation Committee.

47.     According to the 2020 Proxy Statement, Defendant Irvine was the beneficial owner of 63,800 shares of the Company's Class A common stock as of April 3, 2020. As the price of the Company's Class A common stock was $3.18 per share at close on April 3, 2020, Defendant Irvine owned approximately $202,884 worth of Company stock.

48.     Defendant Irvine received $142,275 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $68,750 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

***Defendant Kriger***

49.     Defendant Adam Kriger ("Kriger") is a current Company director, and has served in that role since April 2017. Additionally, he has served as a director of FAH since June 2016, and has served as an executive partner at ACON since August 2017. The 2020 Proxy Statement described Defendant Kriger as follows:

Adam Kriger has served on the Board of Directors of Funko, Inc. since its formation in April 2017, and on the board of directors of FAH, LLC since June 2016. Mr. Kriger is an Executive Partner at ACON Investments L.L.C., which he joined in August 2017. Before that, Mr. Kriger served as the Senior Vice President of Global Strategy for McDonald's Corporation from December 2001 until March 2015. He also previously served as the Senior Vice President of Global Strategy for Starwood Hotels & Resorts Worldwide from 1998 until 1999, and as the Vice President of Strategy and

Development for The Walt Disney Company from 1988 until 1990, and then again from 1992 until 1998. Mr. Kriger serves on the boards of several non-profit organizations and private companies. Mr. Kriger received an M.B.A. from Harvard Business School and a B.A. in Quantitative Economics from Stanford University. We believe Mr. Kriger's extensive strategic, risk management and organizational leadership experience in the public company context make him well-qualified to serve on our Board of Directors.

50.     Defendant Kriger also serves as a member of Funko's Nominating and Corporate Governance Committee.

51.     According to the 2020 Proxy Statement, Defendant Kriger was the beneficial owner of 32,117 shares of the Company's Class A common stock, as well as 16,058 shares of the Company's Class B common stock as of April 3, 2020. As the price of the Company's Class A common stock was $3.18 per share at close on April 3, 2020, Defendant Kriger owned approximately $102,132 worth of Company stock.

52.     Defendant Kriger received $123,525 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $50,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

53.     During the period when the Individual Defendants materially misstated information to the investing public to keep the price of the Company's stock artificially inflated, and before the scheme was exposed, ACON made the following sale of the Company's Class A common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 9/19/2019 | 3,600,000 | $25.42 | $91,512,000 |

54.     ACON's insider sale, which was made with knowledge of material non-public information, demonstrates Defendant Kriger's motive in facilitating and participating in the scheme.

### *Defendant Lunsford*

55.     Defendant Michael Lunsford ("Lunsford") is a current Company director,

and has served in that role since October 2018. The 2020 Proxy Statement described Defendant Lunsford as follows:

> Michael Lunsford has served on the board of directors of Funko, Inc. since October 2018. Mr. Lunsford previously served as the Chief Executive Officer of SK Planet, Inc., an internet platform development company, from September 2014 until August 2018 and as interim Chief Executive Officer of shopkick, Inc. in 2016. From January 2008 to May 2013, Mr. Lunsford held various management roles with RealNetworks, Inc., a provider of internet streaming media delivery software and services, including interim Chief Executive Officer and Executive Vice President and General Manager of RealNetworks' Core Business and Chief Executive Officer of Rhapsody. Mr. Lunsford also served on the board of directors of shopkick, Inc. from 2013 to 2018, and on the boards of directors of various portfolio companies owned by SK Planet, Inc. from 2013 to 2018. Since 2014, Mr. Lunsford has served on the board of directors of the University of North Carolina Board of Visitors and IslandWood. Mr. Lunsford received an M.B.A. and a B.A. in Economics from The University of North Carolina. We believe Mr. Lunsford's broad management, retail and e-commerce experience make him well-qualified to serve on our Board of Directors.

56.     Defendant Lunsford also serves as a member of Funko's Audit Committee.

57.     According to the 2020 Proxy Statement, as of April 3, 2020, Defendant Lunsford was the beneficial owner of 5,098 shares of the Company's Class A common stock. As the price of the Company's Class A common stock was $3.18 per share at close on April 3, 2020, Defendant Lunsford owned approximately $16,211 worth of Company stock.

58.     Defendant Lunsford received $123,525 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $50,000 in fees earned or paid in cash, $36,033 in option awards, and $37,492 in restricted stock units.

### Defendant Levy

59.     Defendant Sarah Kirshbaum Levy ("Levy") is a current Company director, and has served in that role since September 2019. The 2020 Proxy Statement described Defendant Levy as follows:

Sarah Kirshbaum Levy has served on the board of directors of Funko, Inc. since September 2019. Ms. Levy served as the Chief Operating Officer of Viacom Media Networks, a division of the entertainment and media company, ViacomCBS, from 2016 through 2019, where she was responsible for overseeing global strategy, finance and operations for the division. Prior to her appointment at Viacom Media Networks, Ms. Levy was Chief Operating Officer at Nickelodeon from 2005 to 2016. She also currently sits on the board of the Lucius Littauer Foundation, which makes grants in the areas of education, social welfare, health care, and Jewish studies. Ms. Levy received an M.B.A. and B.A. in Economics from Harvard University. We believe Ms. Levy's extensive experience in entertainment and media, in particular her familiarity with consumer products licensing, make her well-qualified to serve on our Board of Directors.

60.     Defendant Levy received $78,737 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $12,500 in fees earned or paid in cash, $36,043 in option awards, and $30,194 in restricted stock units.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

61.     Funko is a Washington-based consumer products company that designs and sells a range of products based on various pop culture franchises.

62.     Specifically, Funko produces action figures, plush toys, accessories, clothing, handbags, homewares, and more, which are modeled after images, characters, and motifs from widely recognized brands including Star Wars, Disney, Marvel Comics, DC Comics, Harry Potter, and Pokémon.

63.     The Company's most well known brand is its Funko Pop! line, which consists of thousands of unique, stylized vinyl figurines depicting people and characters from popular movies, books, TV shows, sports franchises, comics, anime and manga series, and video games.

64.     During the Relevant Period, the Individual Defendants consistently touted the Company's sales and growth in SEC filings and press releases issued by the Company. However, as the Company would later admit, Funko was actually facing lower

than expected sales, and thus the Individual Defendants' claims regarding the Company's financial guidance and prospects were inaccurate and misleading.

65.     Furthermore, in the Company's quarterly reports on Form 10-Q filed with the SEC on August 8, 2019 and October 31, 2019, respectively, the Individual Defendants included only generic risk factors indicating that *if* Funko were to inaccurately predict demand for its products, the Company *could* accumulate excess inventory, which *could* have an adverse impact on the Company's financial prospects. Such statements too, were inaccurate and misleading, as these risk factors were not merely hypothetical, but in fact represented problems that had already materialized for the Company.

**Materially False and Misleading Statements**

***August 8, 2019 Press Release***

66.     The Company announced its financial results for the fiscal quarter ended June 30, 2019 in a press release issued on August 8, 2019 (the "2Q19 Press Release"). The 2Q19 Press Release provided the following with respect to the Company's results for the quarter and general financial outlook:

Second Quarter 2019 Highlights

- Net sales increased 38% to $191.2 million
- Gross profit[] increased 35% to $71.2 million
- Gross margin[] decreased 90 basis points to 37.2%
- Income from operations increased 98% to $17.1 million
- Net income increased to $11.4 million from $0.3 million
- Earnings per diluted share increased to $0.16
- Adjusted Net Income[] was $12.9 million compared to $3.2 million in the second quarter of 2018, and Adjusted Earnings per Diluted Share[] was $0.25, compared to $0.06 in the second quarter of 2018
- Adjusted EBITDA[] increased 61% to $31.4 million

* * *

The Company is raising its outlook for the full year 2019. The Company now expects net sales to be in a range of $840 million to $850 million. Adjusted EBITDA[] is expected to be in a range of $140 million to $145 million. Adjusted Earnings per Diluted Share[] is expected to be in a range of $1.15 per share to $1.22 per share and is based on estimated adjusted average diluted shares outstanding of 53.5 million for the full year 2019.

Adjusted EBITDA and Adjusted EPS are non-GAAP measures. A table at the end of this release reconciles Funko's outlook for the full year 2019 Adjusted EBITDA and Adjusted Earnings per Diluted Share guidance to the most directly comparable U.S. GAAP financial measures. Please refer to the "Non-GAAP Financial Measures" section of this press release.

67.    The 2Q19 Press Release also quoted Defendant Mariotti, stating the following:

Our strong results in the first half of 2019 have allowed us to increase our guidance for the full year. More importantly, the growing range of opportunities for revenue growth, international expansion and entry into new categories make us confident that our best days lie ahead, and that our fans, partners, employees and shareholders can look forward to the future.

### August 8, 2019 Form 10-Q

68.    That same day, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 with the SEC (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Nickel.

69.    The 2Q19 10-Q reported the same financial results contained in the 2Q19 Press Release, and provided the following risk factor related to Funko's inventory levels:

***Our success depends, in part, on our ability to successfully manage our inventories.***

We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and

market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. Alternatively, if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry additional inventory. Policies and practices of individual retailers may adversely affect us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our products that it carries, and reduce the shelf space allotted for our products. If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

(Emphasis in original.)

70.     The 2Q19 10-Q also contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Mariotti and Nickel attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

***October 31, 2019 Press Release***

71.    The Company announced its financial results for the fiscal quarter ended September 30, 2019 in a press release issued on October 31, 2019 (the "3Q19 Press Release"). The 3Q19 Press Release provided the following with respect to the Company's results for the quarter and general financial outlook:

Third Quarter 2019 Highlights

- Net sales increased 26% to $223.3 million
- Gross profit[] increased 26% to $85.5 million
- Gross margin[] decreased 10 basis points to 38.3%
- Income from operations increased 36% to $22.6 million
- Net income increased to $15.5 million from $7.6 million
- Earnings per diluted share increased to $0.25
- Adjusted Net Income[] was $19.9 million compared to $13.6 million in the third quarter of 2018, and Adjusted Earnings per Diluted Share[] was $0.38, compared to $0.27 in the third quarter of 2018
- Adjusted EBITDA[] increased 20% to $40.6 million

* * *

The Company is reiterating its outlook for the full year 2019. The Company expects net sales to be in a range of $840 million to $850 million. Adjusted EBITDA[] is expected to be in a range of $140 million to $145 million. Adjusted Earnings per Diluted Share[] is expected to be in a range of $1.15 per share to $1.22 per share and is based on estimated adjusted average diluted shares outstanding of 53.5 million for the full year 2019.

Adjusted EBITDA and Adjusted EPS are non-GAAP measures. A table at the end of this release reconciles Funko's outlook for the full year 2019 Adjusted EBITDA and Adjusted Earnings per Diluted Share guidance to the most directly comparable U.S. GAAP financial measures.  Please refer to the "Non-GAAP Financial Measures" section of this press release.

### *October 31, 2019 Form 10-Q*

72.    That same day, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 with the SEC (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendant Fall Jung.

73.   The 3Q19 10-Q reported the same financial results contained in the 3Q19 Press Release, and again provided the following risk factor related to Funko's inventory levels:

***Our success depends, in part, on our ability to successfully manage our inventories.***

We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. Alternatively, if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry additional inventory. Policies and practices of individual retailers may adversely affect us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our products that it carries, and reduce the shelf space allotted for our products. If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

(Emphasis in original.)

74.     The 3Q19 10-Q also contained SOX certifications signed by Defendants Mariotti and Fall Jung attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

75.     The statements in ¶¶ 66–74 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) The Company was facing sales that were below expectations; (2) as a result, the Company would predictably incur millions of dollars in write-down to dispose of slow moving inventory; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

76.     On February 5, 2020, after market close, Funko issued a press release announcing the Company's preliminary financial results for the fiscal quarter ended December 31, 2019. The press release disclosed generally disappointing financial results, and indicated slow moving inventory along with a decline in sales. The press release stated the following:

> ***Net sales are expected to be approximately $214 million, a decrease of 8% compared to $233 million in the fourth quarter of 2018. Net sales were below expectations in mature markets, including the U.S., due to the challenging retail environment, which resulted in lower than expected purchases among Funko's top customers throughout the holiday season as well as softness in sales related to certain tentpole movie releases***. These factors more than offset strong growth both in Europe and the Loungefly brand during the quarter.
>
> For the fourth quarter of fiscal 2019, Funko estimates:
>
> - Net sales in the U.S. will decrease approximately 9%, while net sales internationally will decrease approximately 8%, reflecting declines in

mature international markets, including Australia and Canada, partially offset by continued double digit growth in Europe.

- On a product category basis, net sales of figures will decrease approximately 10% and net sales of other products will decrease approximately 3% versus the year ago period, respectively. Net sales of Loungefly items, included in other products, are expected to show continued double digit growth in the fourth quarter offset by declines in other branded products.

- ***The Company will incur a one-time $16.8 million charge related to the write-down of inventory as a result of the Company's decision to dispose of slower moving inventory to increase operational capacity***. This charge is incremental to normal course reserves and will have an unfavorable impact to gross profit[], gross margin[], net loss and net loss per diluted share in the fourth quarter.

- Gross profit[] will be in the range of $62.3 million to $62.8 million, while gross margin1 will be 29.2% to 29.4%. Gross margin excluding the one-time inventory write-down[] will be 37.0% to 37.3%.

- The Company will have a net loss in the range of $6.7 million to $6.0 million and net loss per diluted share of $0.12 to $0.11.

- Adjusted EBITDA[] will be in the range of $24.7 million to $25.7 million.

- Adjusted Net Income[] will be in the range of $8.1 million to $8.9 million and Adjusted Earnings per Diluted Share[] will be in the range of $0.16 to $0.18.

(Emphasis added.)

77.    The press release also revealed that the Company expected that sales trends would not improve until the second half of the year, stating the following:

The Company expects its 2020 net sales growth rate to be in the high-single digits to low-double-digits. Additionally, the Company anticipates that top line trends will improve gradually throughout 2020 and will be largely weighted toward the second half of the year, with net sales in the first half expected to be down low-single-digits to flat compared to the first half of

2019. Funko plans to provide expanded guidance for 2020 in connection with the release of fourth quarter and full year 2019 financial results on March 5, 2020.

78.      Additionally, the press release quoted Defendant Mariotti, stating the following:

"While we are disappointed in our fourth quarter results, we are confident that our strong track record of innovation through new product categories and properties, as well as continued international expansion, will continue to propel the Company in 2020 and beyond. The underlying strength of our Pop! and Loungefly brands, combined with Funko's unique ability to leverage evergreen properties will enable the Company to achieve high-single-digit to low-double-digit sales growth in 2020," stated Brian Mariotti, Chief Executive Officer.

79.      On this news, the price of the Company's stock plunged from $15.49 per share at the close of trading on February 5, 2020, to $9.29 per share at the close of trading on February 6, 2020, a loss of roughly 40%.

80.      Then, after the close of trading on March 5, 2020, the Company issued a press release confirming its financial results for the fiscal quarter and full year ended December 31, 2019. The press release reiterated the disappointing results previously issued by Funko on February 5, 2020, and stated that the Company's declining sales were due to, among other things, "softness at retail during the holiday season which led to a decrease in orders," stating the following:

**Net sales decreased 8% to $213.6 million in the fourth quarter of 2019 compared to $233.2 million in the fourth quarter of 2018**. The year-over-year decline was primarily driven by underperformance in more mature markets, including the U.S., Australia and Canada, and reflects three primary factors: softness at retail during the holiday season which led to a decrease in orders, underperformance in key tentpole properties, and difficult comparisons from the year ago period due to the strength of Fortnite which generated 12% of sales in the fourth quarter of 2018.

In the fourth quarter of 2019, the number of active properties increased 14% to 667 from 583 in the fourth quarter of 2018 and net sales per active property decreased 20%. On a geographical basis, net sales in the United

States decreased 9% to $144.9 million and net sales internationally decreased 8% to $68.6 million due to declines in Australia and Canada, partially offset by strong growth in Europe. On a product category basis, net sales of figures decreased 10% to $170.2 million reflecting the overall softness at retail in the quarter. Net sales of other products decreased 3% to $43.3 million versus the fourth quarter of 2018, which reflects decreased sales in plush and accessories, partially offset by double digit growth in our Loungefly brand.

81.    On this news, the price of the Company's stock fell yet again, sinking from $7.24 per share at the close of trading on March 5, 2020, to $6.92 per share at the close of trading on March 6, 2020, a loss of roughly 4%.

## FUNKO'S CODE OF CONDUCT

82.    Funko's Code of Conduct states that the Code of Conduct "applies to all of our directors, officers and other employees."

83.    In its section on "Compliance with Laws and Regulations," the Code of Conduct provides as follows, in relevant part:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's General Counsel.

\* \* \*

Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis

of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's General Counsel for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider trading laws.

\* \* \*

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Regarding Communications with Analysts, Securityholders and Others to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

84.     In its section on "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct provides as follows:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable.

These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

85.     In its section on "Protection and Use of Company Assets," the Code of Conduct provides as follows:

Employees should protect the Company's assets and ensure their efficient use for legitimate business purposes only and not for any personal benefit or the personal benefit of anyone else. Theft, carelessness and waste have a direct impact on the Company's financial performance. The use of Company funds or assets, whether or not for personal gain, for any unlawful or improper purpose is prohibited.

Employees should be aware that Company property includes all data and communications transmitted or received to or by, or contained in, the Company's electronic or telephonic systems. Company property also includes all written communications. Employees and other users of this property should have no expectation of privacy with respect to these communications and data. To the extent permitted by law, the Company has the ability, and reserves the right, to monitor all electronic and telephonic communication. These communications may also be subject to disclosure to law enforcement or government officials.

86.     In its section on "Company Records," the Code of Conduct provides as follows:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology, products and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the

Company's General Counsel to obtain a copy of any such policy or with any questions concerning any such policy.

87.    In its section on "Competition and Fair Dealing," the Code of Conduct provides as follows:

> All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors. Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they employ with regard to Company-developed intellectual property. Employees should also handle the nonpublic information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology, products and product pipelines.

88.    The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, and failing to report the same. Moreover, four of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## FUNKO'S AUDIT COMMITTEE CHARTER

89.    Funko's Audit Committee Charter states the following with respect to the duties of the Company's Audit Committee, in relevant part:

> The purpose of the Audit Committee (the "Committee") is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company.

* * *

The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

\* \* \*

The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

\* \* \*

The Committee should discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

90.     Defendants Denson, Irvine, and Lunsford, who served as members of the Audit Committee during the Relevant Period, violated the Audit Committee Charter by failing to ensure the integrity of the Company's financial statements and internal controls, allowing the Company to issue false and misleading financial statements with the SEC.

## DAMAGES TO FUNKO

91.     Due to the Individual Defendants' misconduct, Funko will lose and expend many millions of dollars.

92.     These expenditures include any legal fees incurred in connection with the Securities Class Actions filed against the Company, its CEO, its CFO, and its former CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

93.     These expenditures also include compensation, benefits, and other payments provided to the Individual Defendants which was excessive in light of the Individual Defendants' breaches of fiduciary duties to the Company and other misconduct.

94.     As a direct result of the Individual Defendants' misconduct, the Company has suffered and will continue to suffer a loss of reputation and goodwill, as well as a

"liar's discount" that will negatively impact the Company's stock in the future due to the Individual Defendants' misrepresentations and their breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

95.     Plaintiff brings this action derivatively and for the benefit of the Company to redress injuries suffered, and to be suffered, due to the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Funko, as well as the aiding and abetting thereof.

96.     Funko is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.     Plaintiff is, and has continuously been since before the beginning of the Relevant Period, a Company shareholder. Plaintiff will fairly and adequately represent the interests of the Company in prosecuting and enforcing the Company's rights, and in furtherance of that end, Plaintiff has retained counsel experienced in derivative litigation to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

98.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

99.     A pre-suit demand on the Board of Funko is futile and, thus, excused. As of the date of the filing of this action, the Company's Board consists of the following eight Individual Defendants: Defendants Mariotti, Brotman, Dellomo, Denson, Irvine, Kriger, Lunsford, and Levy (together, the "Directors"). Plaintiff needs only to allege demand futility as to four out of the eight Directors on the Company's Board at the time this action was commenced.

100.    Demand is excused as to all eight Directors, because each one of them faces a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while four of the Directors engaged in lucrative insider

sales based on material non-public information, receiving combined proceeds of over $104 million, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

101.   In abdication of their fiduciary duties to Funko, the Directors knowingly or recklessly participated in making and/or causing the Company to make the false and misleading statements and omissions of material fact described herein. The fraudulent scheme was, among other things, designed to make the Company appear more profitable than it actually was, and thus more attractive to investors, as well as to disguise insider sales. Due to the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is therefore excused as being futile.

102.   Specific reasons why demand on each Director is futile are as follows:

### Defendant Mariotti

103.   Defendant Mariotti is the Company's current CEO, and has served in that role since April 2017. He has also served as the CEO of FAH since October 2015, and as the CEO of FHL since May 2013. As the Company admits, Defendant Mariotti is a non-independent director. Funko provides Defendant Mariotti with his principal occupation, and he received $4,025,457 in compensation from the Company during the 2019 fiscal year.

104.   Defendant Mariotti was responsible for all of the materially false and misleading statements and omissions described herein, including those contained in the Company's SEC filings and press releases. As the Company's CEO and as a trusted Company director, Defendant Mariotti conducted little to no oversight of the scheme to cause the Company to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect corporate assets. Defendant Mariotti's motive in

facilitating the fraudulent scheme is further evidenced by his insider trading, which netted him over $13.3 million in proceeds. Additionally, Defendant Mariotti is a named defendant in the Securities Class Actions and faces a substantial likelihood of liability in connection thereto.

105. As such, Defendant Mariotti breached his fiduciary duties, is not independent or disinterested, and faces a significant likelihood of liability. Therefore, demand upon him is excused as being futile.

### Defendant Brotman

106. Defendant Brotman is the Company's current Chairman of the Board, and has served as a Company director since April 2017. Defendant Brotman also co-founded and currently serves as a managing partner at ACON, and has served as a director of FAH since October 2015. Additionally, Defendant Brotman serves as the Chair of Funko's Nominating and Corporate Governance Committee, and as a member of its Compensation Committee. Defendant Goldman has received and continues to receive compensation from the Company described herein.

107. As a trusted Company director, Defendant Brotman conducted little to no oversight of the scheme to cause the Company to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Defendant Brotman's motive in facilitating the fraudulent scheme is further evidenced by ACON's insider sale before the fraud was exposed, which yielded over $91.5 million in proceeds.

108. As such, Defendant Brotman breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

### Defendant Dellomo

109.   Defendant Dellomo is a current Company director, and has served in that role since April 2017. He has also served as a director of FAH since October 2015, and as a director at ACON since October 2006. Additionally, Defendant Dellomo serves as a member of Funko's Nominating and Corporate Governance Committee. Defendant Dellomo has received and continues to receive compensation from the Company as described herein.

110.   As a trusted Company director, Defendant Dellomo conducted little to no oversight of the scheme to cause the Company to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Defendant Dellomo's motive in facilitating the fraudulent scheme is further evidenced by ACON's insider sale before the fraud was exposed, which yielded over $91.5 million in proceeds.

111.   As such, Defendant Dellomo breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

### Defendant Denson

112.   Defendant Denson is a current Company director, and has served in that role since April 2017. He has also served as a director of FAH since June 2016. Additionally, Defendant Denson serves as the Chair of Funko's Compensation Committee, and as a member of its Audit Committee. Defendant Denson has received and continues to receive compensation from the Company described herein.

113.   As a trusted Company director, Defendant Denson conducted little to no oversight of the scheme to cause the Company to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets.

Verified Shareholder Derivative Complaint

114. As such, Defendant Denson breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

### Defendant Irvine

115. Defendant Irvine is a current Company director, and has served in that role since August 2017. She has also served as a director of FAH since August 2017. Additionally, Defendant Irvine serves as the Chair of Funko's Audit Committee, and as a member of its Compensation Committee. Defendant Irvine has received and continues to receive compensation from the Company as described herein.

116. As a trusted Company director, Defendant Irvine conducted little to no oversight of the scheme to cause the Company to make false and misleading statements. She also consciously disregarded her duties to monitor controls over reporting and engagement in the scheme, and disregarded her duties to protect the Company's assets.

117. As such, Defendant Irvine breached her fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon her is excused as being futile.

### Defendant Kriger

118. Defendant Kriger is a current Company director, and has served in that role since April 2017. He has also served as a director of FAH since June 2016, and has served as an executive partner at ACON since August 2017. Additionally, Defendant Kriger serves as a member of Funko's Nominating and Corporate Governance Committee. Defendant Kriger has received and continues to receive compensation from the Company described herein.

119. As a trusted Company director, Defendant Kriger conducted little to no oversight of the scheme to cause the Company to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets.

Defendant Kriger's motive in facilitating the fraudulent scheme is further evidenced by ACON's insider sale before the fraud was exposed, which yielded over $91.5 million in proceeds.

120.   As such, Defendant Kriger breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

### Defendant Lunsford

121.   Defendant Lunsford is a current Company director, and has served in that role since October 2018. Additionally, Defendant Lunsford serves as a member of Funko's Audit Committee. Defendant Lunsford has received and continues to receive compensation from the Company as described herein.

122.   As a trusted Company director, Defendant Lunsford conducted little to no oversight of the scheme to cause the Company to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets.

123.   As such, Defendant Lunsford breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

### Defendant Levy

124.   Defendant Levy is a current Company director, and has served in that role since September 2019. Defendant Levy has received and continues to receive compensation for her role as a director as described herein.

125.   As a trusted Company director, Defendant Levy conducted little to no oversight of the scheme to cause the Company to make false and misleading statements. She also consciously disregarded her duties to monitor controls over reporting and engagement in the scheme, and disregarded her duties to protect the Company's assets.

126.   As such, Defendant Levy breached her fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon her is excused as being futile.

### Additional Reasons

127.   Further reasons why demand on the Board is futile are as follows:

128.   Defendants Denson, Irvine, and Lunsford (the "Audit Committee Defendants"), served as members of Funko's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, among other things, the integrity of the Company's financial statements and the Company's accounting and financial reporting processes. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and of the Company's internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading statements with the SEC. As such, the Audit Committee Defendants breached their fiduciary duties to the Company and are not disinterested. Therefore, demand as to them is excused as being futile.

129.   As described herein, four of the Directors engaged in lucrative insider trading, in violation of federal law and the Company's Code of Conduct. Defendant Mariotti, as well as Defendants Brotman, Dellomo, and Kriger through their respective positions at ACON, netted total proceeds of over $104 million through insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements described herein. For this reason too, demand as to them is excused as being futile.

130.   The Directors have extensive business relationships with each other and the Individual Defendants that prevented them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Brotman, Dellomo, and Kriger currently serve as high-ranking officers or directors of ACON,

which controlled approximately 40.1% of total voting power over matters presented to Company shareholders for determination as of April 3, 2020, which includes the election of Company directors. Furthermore, Defendants Mariotti, Brotman, Dellomo, Denson, Irvine, and Kriger currently serve as directors of FAH, with Defendant Mariotti serving as the CEO of FAH. These conflicts of interest prevented the Directors from conducting sufficient oversight over the Company's operations and internal controls, and precluded them from calling into question the Individual Defendants' misconduct. As such, demand upon the Directors is excused as futile.

131.   In violation of the Code of Conduct, the Directors conducted little to no oversight of the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty. Moreover, four of the Directors violated the Code of Conduct by engaging in insider trading. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner. For this reason too, the Directors face a substantial likelihood of liability and demand is futile as to them.

132.   The Company has been and will continue to be exposed to substantial losses and expenditures as a result of the misconduct described herein. Yet, the Directors have not filed any lawsuits against themselves or other individuals who were responsible for this misconduct to attempt to recover for Funko any part of the damages Funko suffered and will continue to suffer in connection with such misconduct. Thus, demand upon the Directors is futile.

133.   The Individual Defendants' conduct described herein was based on bad faith and intentional, reckless, or disloyal misconduct, and therefore could not have been the product of legitimate business judgement. As such, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent

such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. For this reason, demand is excused as being futile.

134.   The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

135.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., funds belonging to Company shareholders. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As such, if the Directors were to sue themselves or certain of the officers of Funko, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is excused as being futile.

136.   If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. As such, demand is futile in that event, as well.

137.   Therefore, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with

disinterestedness and independence. Thus, a demand upon the Board is futile, and therefore, excused.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

138.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139.    Each Individual Defendant owed to Funko the duty to exercise candor, good faith, and loyalty in the management and administration of Funko's business and affairs.

140.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

141.    The Individual Defendants' conduct described herein was due to their intentional or reckless breach of the fiduciary duties they owed to Funko, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

142.    In breach of their fiduciary duties owed to Funko, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) The Company was facing sales that were below expectations; (2) as a result, the Company would predictably incur millions of dollars in write-down to dispose of slow moving inventory; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

143.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while four of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

144.   The Individual Defendants also breached their fiduciary duties by failing to maintain internal controls.

145.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Funko's securities and disguising insider sales.

146.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Funko's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

147.   These actions were not a good-faith exercise of prudent business judgment to protect and promote Funko's corporate interests.

148.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Funko has sustained and continues to sustain significant

damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

149.   Plaintiff on behalf of Funko has no adequate remedy at law.

## SECOND CLAIM

### Against Defendants Mariotti, Fall Jung, and Nickel for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

150.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.   Funko, along with Defendants Mariotti, Fall Jung, and Nickel are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of law, the Company's liability will be in whole or in part due to Defendants Mariotti, Fall Jung, and Nickel's willful and/or reckless violations of their obligations as officers and directors of Funko.

152.   Through their positions of control and authority as officers and directors of Funko, Defendants Mariotti, Fall Jung, and Nickel were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Actions and herein.

153.   As such, Defendants Mariotti, Fall Jung, and Nickel are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

154.   Accordingly, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Mariotti, Fall Jung, and Nickel.

## PRAYER FOR RELIEF

155.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Funko, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Funko;

(c)   Determining and awarding to Funko the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Funko and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Funko and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Funko to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Funko restitution from the Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: June 10, 2020                         Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Michael Igelido am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of ___6/5/2020___, 2020.

DocuSigned by:

*Michael Igelido*

DCF390590B234BB...

Michael Igelido